UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SANDY REYNOSO,

                Plaintiff,

                                    **MEMORANDUM & ORDER**
    - against -                               21-CV-6706 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
----------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Plaintiff Sandy Reynoso, proceeding *pro se*, petitions for judicial review of the Commissioner of Social Security Administration's ("SSA" and "Commissioner") denial of his claim for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g). Presently before the Court is the Commissioner's motion for judgment on the pleadings, which Plaintiff opposes. (Dkts. 12, 13, 15.) For the foregoing reasons, the Court grants the Commissioner's motion and dismisses this case.

BACKGROUND

**I.    Factual Background**

      Plaintiff is a 48-year-old resident of Queens who has been diagnosed with epilepsy. (Tr. 31, 453; *see also* Dkt. 1.)[1] In October 2013, Plaintiff fainted in his workplace and was transported to a hospital emergency room in East Flushing, Queens. (Tr. 288, 382.) At the time, Plaintiff had "no known [history] of seizures, except possible seizures around age 5-6." (Tr. 382, 288 (labeling the ER form "Seizure, First-Time").) Nestor B. Nestor, M.D., discharged Plaintiff and referred him to a neurologist. (Tr. 288–89, 390.) Plaintiff failed to follow up with a neurologist. (Tr. 395

---

      [1] All references to "Tr." refer to the consecutively paginated Administrative Transcript.

1

(noting a "history of one prior seizure October 2013, with scheduled neurology follow up he did not attend").) About 16 months later, in February 2015, Plaintiff experienced another seizure and again ended up in the same emergency room in East Flushing.[2] (Tr. 295, 395.) This time, Sandra Sallustio, M.D., discharged Plaintiff and referred him to a neurologist. (Tr. 403.)

In May 2015, neurologist Nurkia Mihu, M.D., began seeing Plaintiff regularly at two-to-three-month intervals. (Tr. 313, 483–86.)[3] She diagnosed Plaintiff with "[l]ocalized-related . . .

---

[2] There is some ambiguity in the record as to whether Plaintiff had this second seizure in March or February of 2015. Hospital records show that on February 2015 Plaintiff was hospitalized due to a seizure at work (Tr. 395), and in March 2015, arrived at the same hospital for a "medication refill." (Tr. 405–06 (noting that on 03/23/2015 Plaintiff "deni[ed] any complaints" during his hospital visit and was given a medication refill").) Nonetheless, Plaintiff's doctors noted that Plaintiff's seizure occurred on 03/23/2015, and never mentioned the February seizure. (*See, e.g.*, Tr. 483 (noting that Plaintiff had an "episode on 3, 23 2015").) Plaintiff himself listed both seizures in the questionnaire he filed to the Commissioner. (Tr. 228.) The Court finds that the precise date of the 2015 seizure is of no consequence. The medical sources in the record agreed that only one seizure occurred in 2015 (whether in February or March). (*See, e.g.*, Tr. 373 ("In 2015 [Plaintiff] had one episode of grand mal seizure.").) Further, even if two seizures occurred in 2015, the result would remain the same for the reasons discussed, *infra*, namely, the absence of any evidence to support a finding of marked limitations.

[3] Despite some ambiguity in the record, the Court finds that the SSA obtained the correct notes from Plaintiff's neurologist. Plaintiff referred to his neurologist by different names throughout the proceedings— "Angelino Pegero, M.D.," "Angeline Mihu Peguero, MD" and "Angelina Mihu Peguero MD." (Tr. 43, 274–75.). The treatment notes, however, belong to a doctor named "Nurkia A. Mihu, M.D." (Tr. 453–86.) A few reasons convince the Court that the correct notes are in the record. First, as explained further below, Plaintiff's neurologist had died while his case was pending in the summer of 2020. (Tr. 278.) Before and after the death of Plaintiff's neurologist, Plaintiff and the SSA faxed and emailed the same clinic to obtain the notes. (Tr. 274–82.) Second, on June 11, 2020, Plaintiff himself faxed the relevant notes to the SSA (Tr. 452, 486 ("From: Sandy Reynoso")) and followed up with a phone call to confirm their receipt. (Tr. 282.) Thus, it was Plaintiff himself who provided the relevant notes to the SSA and stated following their receipt that the record was "now complete." (*Id.*) Third, the Court notes that Plaintiff's primary physician noted that Plaintiff's neurologist was "Nurkia Mihu." (Tr. 434; *see also* Tr. 439 (noting in 2019 that Plaintiff's neurologist was "DR Mihu").) Finally, the Court takes judicial notice of the fact that on file with the New York State Physician Registry appears a doctor, who is licensed as a neurologist, operating under the same address appearing in Plaintiff's progress notes, whose legal name is "Nurkia Angelina Mihu," and whose practice is named "Angelina Mihu MD P.C." (*Compare* New York State Physician Registry, https://www.nydoctorprofile.com/NYPublic/dispatch (type Nurkia under "First Name:" and Mihu

epilepsy and epileptic syndromes with complex partial seizures," and "[g]eneralized convulsive epilepsy." (Tr. 484.) Plaintiff began taking 250 milligrams of Keppra (Tr. 483), and roughly six months later, Dr. Mihu noted that "Mr. Reynoso . . . feel[s] good. No seizure. No side effect[s]." (Tr. 479.) In February 2016, however, Plaintiff had another seizure while at home. (Tr. 411, 477.) Dr. Mihu increased Plaintiff's Keppra dosage to 500 milligrams. (Tr. 478.) For the next two years, up until June 2018, Dr. Mihu consistently noted that "Mr. Reynoso . . . [had] no more seizure[s]." (Tr. 475, 473, 471, 469, 467, 465.)[4] In October 2018, Plaintiff visited the emergency room in East Flushing again because of another seizure. (Tr. 419.) Chandni Kartan Pawar, M.D., reported that, before the seizure, Plaintiff "miss[ed] his Thursday evening and Friday morning dose[s] of [K]eppra[.]" (Tr. 420) In November 2018, Dr. Mihu increased Plaintiff's Keppra dose to 750 milligrams. (Tr. 462.) During his next visit, Plaintiff reported symptoms of "aggressive behavior and depression," which Dr. Mihu noted "could be likely secondary to the Keppra usage." (Tr. 459–60.) Because of these side effects, Dr. Mihu asked Plaintiff to discontinue his usage of Keppra, and instead prescribed him 300 milligrams of Trileptal. (Tr. 459.)[5] No seizures were

---

under "Last Name:," and select "Practice Info") *with* Tr. 455.) Based on these facts, the Court finds that the SSA obtained the correct records from Plaintiff's deceased neurologist, Dr. Mihu.

[4] When examined by the SSA's consultant psychologist, Dr. Mentwab Wuhib, Ph.D., Plaintiff stated that he was hospitalized for seizures "twice" in 2017. (Tr. 358.) A full review of all Plaintiff's hospital records reveals no documentation of the 2017 incidents, which are inconsistent with Dr. Mihu's reports and at odds with Plaintiff's report during a 2018 hospital visit. (Tr. 420 (noting that Plaintiff's seizures were "well controlled on [Keppra] since 2013 [and Plaintiff reports] having one episode a year since 2013 on this regimen . . . none requiring hospitalization").) As discussed *infra*, despite finding that there was no evidence in the record to substantiate Plaintiff's account, the Administrative Law Judge ("ALJ") who held a hearing in Plaintiff's case before the SSA accepted it as true. (Tr. 18 (noting seizures in April and August 2017).) As explained below, like the ALJ, the Court finds that even accepting as true Plaintiff's account—which finds little support in the record—his claim for disability fails.

[5] At the hearing before the ALJ in April 2020, Plaintiff claimed that he was again taking 250 milligrams of Keppra, and in his notice of appeal, that he was taking 750 milligrams of Keppra. (Tr. 49, 177.) Assuming *arguendo* the correctness of both representations, the Court finds that any

3

reported for the next year, and in October 2019, Dr. Mihu reiterated that Plaintiff was "feeling good." (Tr. 453.) In May 2020, Dr. Mihu passed away. (Tr. 278.)

At around the same time, Plaintiff also met with Jose F. Delmonte, M.D., an internist, intermittently. Plaintiff appears to have first met Dr. Delmonte in April 2015 shortly after his seizure in February or March of 2015,[6] and was diagnosed with epilepsy. (Tr. 433.) In 2017, Plaintiff again saw Dr. Delmonte and reported that he was a "regular marijuana user" and wanted a prescription for medical marijuana for his seizures. (Tr. 437.) Dr. Delmonte advised Plaintiff to discuss the matter with his neurologist. (*Id.*) In January 2019, Plaintiff asked Dr. Delmonte to prescribe him a "shower chair," and was again advised to follow up with his neurologist. (Tr. 439.) Eight months later, Plaintiff met Dr. Delmonte again and asked for a "home attendant." (Tr. 442.) When Dr. Delmonte "tr[ied] to explain that [the process] do[es] not function like that," Plaintiff "abandoned the office and slang the door." (Tr. 442.) Dr. Delmonte then terminated his relationship with Plaintiff. (Tr. 445.) In February 2019, Dr. Delmonte completed an opinion form about Plaintiff's condition. (Tr. 447.) He opined that Plaintiff's communication skills were "normal," that Plaintiff could care for himself "as a normal person," and that Plaintiff was "able

---

adjustment in Plaintiff's medication regimen was not an informational gap that required the ALJ to further develop the record before the SSA. Indeed, Plaintiff testified before the ALJ, six months after his last recorded visit to Dr. Mihu, that his underlying condition had remained the same. (Tr. 49 ("Q: So you suffer from seizures at least one to two times a year? A: Yeah. It's in the paper. Q: All right. And that's since 2013? A: At least[.]").) Similarly, after the hearing, Plaintiff communicated telephonically that the record had been completed, and the Commissioner also contacted Dr. Mihu by fax, and her secretary telephonically, at least three times to request all of the relevant records. (Tr. 275–76, 282, 449.) It is well-established that "[w]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (cleaned up).

[6] *See supra* footnote 2.

4

to make decisions," but the form also noted that other information relating to work-tolerance and work-skills should be "obtained from [the] specialist caring for [Plaintiff's] epilepsy." (Tr. 448.)

In connection with Plaintiff's disability claim, three consultants examined Plaintiff in mid-2019. In April 2019, Lyudmila Trimba, M.D., an internist, examined Plaintiff and diagnosed him with a "[h]istory of seizure disorder." (Tr. 356.) She also found that there was "no limitation in [Plaintiff]'s ability to sit, stand, and walk for prolonged time," but found "mild to moderate limitation in his ability to push, pull, or carry heavy objects." (*Id.*) In the same month, psychologist Dr. Wuhib examined Plaintiff and diagnosed him with unspecified depressive and anxiety disorder but found "no limitation" with respect to simple instructions and "mild limitations" with respect to complex instructions. (Tr. 360–61.) In July of that year, Dr. Chaim Stock, D.O., an osteopath, noted that Plaintiff had reported histories of "seizure disorder, grand mal type," "decreased short-term memory," and "concentration and comprehension." (Tr. 375.) He also opined that Plaintiff "should refrain from unprotected elevated heights, driving, using heavy equipment, and handling blunt instruments." (*Id.*)

## II.   Procedural Background

Plaintiff protectively filed for SSI benefits in March 2018, alleging an onset date of January 2013. (Tr. 58–59.) In May 2019, the Commissioner initially denied the claim. (Tr. 68.) In April 2019, Plaintiff entered a representation agreement with the law firm of Treyvus & Konski in connection with his disability claim. (Tr. 97–99.) In June 2019, Plaintiff moved for reconsideration of the initial denial (Tr. 69), reporting a "condition of [the] 'right eye'," but stating that this condition did not limit his ability to work, and refusing to be examined by a doctor.[7] The

---

[7] On September 3, 2019, Plaintiff called the SSA and stated that there was "nothing wrong with his eyes that prevent him from working[,]" he did not "take any medication for his eyes," and

5

Commissioner denied that request in September 2019. (Tr. 81.) Two months later, Plaintiff moved for a hearing before an ALJ. (Tr. 99.) In February 2020, Plaintiff's counsel withdrew from representing him. (Tr. 158–59.)[8] On April 6, 2020, ALJ Gloria Pellegrino held a hearing.[9] On

---

he was filing only with respect to "his seizures." (Tr. 249 ("[Plaintiff] wants [a] determination made with evidence on file in regards to his seizures and again stated that his eyes are fine.").)

[8] Plaintiff's prior counsel wrote to the SSA that when they were retained "Mr. Reynoso made certain representations to our firm about his medical condition, medical treatment and other relevant matters." (Tr. 158.) However, after counsel obtained and reviewed Plaintiff's medical records, they did not "believe that [they] [could] provide the court with sufficient medical evidence to substantiate a finding of disability." (Tr. 159.)

[9] At the outset of the hearing, which was conducted by telephone due to the pandemic, the ALJ advised Plaintiff of his options regarding representation in the case:

> **ALJ**: All right, so you had -- you had legal representation. You had an attorney represent you. They withdrew from the case on February 27, 2020. Right now, you don't have anyone representing you, so you have two options. You can go forward with today's hearing and just present the case to me, yourself or you can ask for a postponement, so that you can have time to go out and find someone to represent you. Find a replacement representative for your case. If you want time to go out and find representation, I will give you a lot of time because under the circumstances, a lot of these offices are closed and you may have difficulty finding representation.
>
> **Plaintiff**: No. I would like to proceed. I have, like, five years, proceeding takes [sic].
>
> **ALJ**: All right. So let me just go over with you, your right to representation. All right? Since you're not represented, I'm required to explain to you that you have a right to be represented by an attorney or a non-attorney. The person can help you obtain and submit records, explain medical terms, make requests, protect your rights, and just present the evidence, in the light most favorable to your case. A representative may not charge or receive a fee, unless I approve it and then they normally do not get paid, unless you're awarded benefits, in which case, they can accept 25% of your back benefits or 6,000, whichever is less. But a representative may charge you for certain expenses, such as obtaining and copying medical records. There are some legal service organizations out there that will offer you free legal representation, if you qualify under their rules, which is normally needs based. Of course, as I mentioned, you can also proceed today without any representation. Do you understand your right to representation?
>
> **Plaintiff**: Yes.

6

July 29, 2020, ALJ Pellegrino issued a decision finding Plaintiff not disabled and denying his application for SSI benefits. (Tr. 23, 29.) On October 26, 2021, the Appeals Council denied Plaintiff's request for review. (Tr. 1–4.) On November 23, 2021, Plaintiff timely filed this action. (Dkt. 1.)[10]

---

(Tr. 37–38.)

      The Court notes that the ALJ's advice to Plaintiff may have had a discouraging effect and led him to believe that finding new counsel would be difficult, if not impossible, because of the pandemic. While the ALJ ultimately obtained Plaintiff's consent to proceed *pro se*, the Circuit has recognized that, in certain circumstances, more than consent is required for a hearing to be fair. *See Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 756–57 (2d Cir. 1982) (finding that the ALJ had a heightened duty to inquire when a person who appeared at a hearing to testify appointed himself counsel to a *pro se* plaintiff who spoke virtually no English, without having studied the file or ever having tried a disability case). The Circuit has never considered whether the difficulties of proceedings *pro se* telephonically during a pandemic, when an ALJ suggests to plaintiff that finding representation may be a laborious and protracted process, required more than just obtaining consent. However, as discussed *supra*, Plaintiff was represented up until two months before the hearing, the record before the ALJ was fully developed, and nothing suggests that a different result would have been reached had Plaintiff obtained counsel. Under these circumstances, the Court finds no need to resolve whether the ALJ's advice to Plaintiff regarding his self-representation was adequate.

   [10]   According to 42 U.S.C. § 405(g):

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which [he] was a party. . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to [him] of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). The appeal was denied on October 26, 2021, (Tr. 1), and the Complaint was filed on November 23, 2021, (Complaint, Dkt. 1), 27 days after the presumed receipt date of the decision, rendering this appeal timely.

      Timeliness notwithstanding, Plaintiff's request for review is one sentence long: "diagnosed with epilepsy seizure disorder." (Dkt. 1, at 1.) Further, Plaintiff nowhere moves to remand this

7

**III.    The ALJ's Decision**

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).[11] First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If the answer is yes, the plaintiff is not disabled. *Id.* If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment. *Id.* § 416.920(a)(4)(ii). An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities." *Id.* § 416.922(a). If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled. *Id.* § 416.920(a)(4)(ii). But if the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether the plaintiff has an impairment that meets or medically equals one of the impairments listed in 20 C.F.R. § Part 404, Subpart P, Appendix 1 ("the Listings"). *Id.* § 416.920(a)(4)(iii); *see also id.* Pt. 404, Subpt. P, App'x 1. If the ALJ determines at step three that the plaintiff has an impairment that meets or equals one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Social Security Act. *Id.* § 416.920(a)(4)(iii). On the other hand, if the plaintiff does not have a such an impairment, the ALJ must determine the plaintiff's residual

---

case to the agency. Nonetheless, the Court has independently considered all portions of the record, the ALJ's decision, and relevant case-law in reaching its determination.

[11] Some of the cases cited herein involve disability insurance benefits ("DIB") regulations, while this case involves SSI, but the DIB and SSI regulations are "virtually identical." *Canter v. Saul*, No. 19-CV-157 (KAD), 2020 WL 887451, at *1 n.2 (D. Conn. Feb. 24, 2020). The DIB regulations are found at 20 C.F.R. § 404.900 *et seq.*, while the parallel SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*

functional capacity ("RFC") before continuing on to steps four and five. To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." *Id.* § 416.945(a)(1). The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work. *Id.* § 416.920(a)(4)(iv). If the answer is yes, the plaintiff is not disabled. *Id.* Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. *Id.* § 416.920(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

Here, at the first step of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the March 2018 application date. (Tr. 17.) At step two of the analysis, the ALJ determined that Plaintiff had one severe impairment, a seizure disorder. (*Id.*) The ALJ also applied the "special technique," set forth in 20 C.F.R. § 416.920a, to examine Plaintiff's mental impairments. "This technique requires the reviewing authority to determine first whether the claimant has a 'medically determinable mental impairment.'" *Kohler v. Astrue*, 546 F.3d 260, 265–66 (2d Cir. 2008). In reliance on Dr. Wuhib's opinion, the ALJ found that Plaintiff had two medically determinable mental impairments: unspecified depression and anxiety disorder. (Tr. 17.) Applying the "special technique" under 20 C.F.R. § 416.920a, the ALJ noted that Dr. Wuhib found only "mild limitations," cited the conclusions of the SSA's consultative examiners, and noted that neither of Plaintiff's treating physicians' (Dr. Delmonte and Dr. Mihu) findings were "remarkable" with respect to Plaintiff's mental limitations. (Tr. 17.) Based on the foregoing, the ALJ identified each of the "broad functional areas" mentioned in 20 C.F.R. § 416.920a(c)(3), and concluded that the limitations were non-severe.

9

At step three of her analysis, the ALJ considered Listing 11.02, and found that Plaintiff's impairment did not meet or equal the severity of any impairment in the list. (Tr. 18.) The ALJ noted that Plaintiff had reported "grand mal type" seizures, and examined subparts A and C of the list, noting that disability is established upon a showing of one of the following:

> A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)
>
> . . . .
>
> B. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
>   Physical functioning (see 11.00G3a); or
>   Understanding, remembering, or applying information (see 11.00G3b(i)); or
>   Interacting with others (see 11.00G3b(ii)); or
>   Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
>   Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Part 404, Subpt. P, App'x 1, § 11.02(A), (C). The ALJ noted that the record showed that Plaintiff had one seizure in 2013, one in 2015, one in 2016, two in 2017, and one in 2018. (Tr. 18.) The ALJ concluded that the seizure frequency did not meet either of the pertinent criteria.

At step four of her analysis, the ALJ found that Plaintiff had the RFC "to perform a range of light work," assuming various limitations, including the avoidance of "hazards such as dangerous moving machinery or unprotected heights," and only "occasional contact with the public." (Tr. 19.) The ALJ considered both Plaintiff's mental limitations and seizure history. As to the latter, the ALJ's decision notes that while Plaintiff had a history of seizures, they were generally infrequent, with the last one occurring in the context of missed medications. (Tr. 20.) The ALJ also noted that Plaintiff's treating physicians noted that he "generally denied seizure activity and medication side effects," and found the opinions of consultative examiners Drs. Shtock, Trimba, and Wuhib—which generally found no, or mild, limitations in Plaintiff's

10

functioning—persuasive. (Tr. 21.) The ALJ relied on the same evidence, along with the state agency medical consultants who initially denied Plaintiff's claim and concluded that the record was consistent with "mild" mental limitations. (*Id.*) Thus, the ALJ concluded that the "overall record [was] consistent with no more than mild work-related mental restrictions given the claimant's lack of treatment, as well as the normal mental status examinations documented in progress note." (*Id.*)

With respect to step five of the analysis, a vocational expert testified at the hearing before the ALJ that a person with Plaintiff's RFC would be able to work as a "routing clerk," "power screwdriver operator," and "mail clerk." Based on the foregoing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act").

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). However, in reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (2d Cir. 2012) (quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118

11

(2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. *See* 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## DISCUSSION

### I.    The ALJ Adequately Developed the Record

Although neither party has raised this issue, the Court must satisfy itself that the record was adequately developed. *See Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 162 (S.D.N.Y. 2022) ("As a threshold matter, this Court must independently consider the question of whether the ALJ failed to satisfy his duty to develop the [r]ecord." (cleaned up)). As Plaintiff filed his SSI application after March 27, 2017, it is not subject to the "treating physician rule." Nonetheless, there is a growing consensus amongst courts applying the new regulations that an ALJ's obligation to develop the record still requires her to obtain the opinion of a claimant's treating physician. *See, e.g., Ayala v. Kijakazi*, No. 20-CV-09373 (RWL), 2022 WL 3211463, at *21 (S.D.N.Y. Aug. 9, 2022) ("Under the new regulations, courts often find that an informed decision could not be reached where an ALJ failed to obtain opinion evidence from the plaintiff's long-term treating physicians") (collecting cases). Here, the ALJ obtained the relevant treating physician opinions to the extent possible. The record contains the opinion of Plaintiff's treating internist, Dr. Delmonte. (Tr. 448.) Although Dr. Mihu was Plaintiff's neurologist, because she passed away before the conclusion of Plaintiff's proceedings before the SSA (Tr. 278), her opinion could not be obtained. *See Quijano v. Comm'r of Soc. Sec.*, No. 20-CV-3363 (PKC), 2022 WL 955144, at *6 (E.D.N.Y. Mar. 30, 2022) (finding that the record was sufficiently developed, in the absence of a treating-source opinion, because plaintiff "had [no] physician from whom the ALJ [could have] obtain[ed] an opinion," as plaintiff "primarily sought care not through regular treatment, but in hospital emergency departments."). Plaintiff also advised the SSA that all relevant documents had been

12

sent to the Commissioner and that the record was complete. (Tr. 282.) Thus, the Court finds that the record was sufficiently developed.

## II.     The ALJ's Decision is Free of Legal Error and is Supported by Substantial Evidence

### A.     The ALJ Correctly Evaluated Plaintiff's Mental Impairments

At step two of the analysis, the ALJ also correctly determined that Plaintiff's mental impairments were not severe. First, having found that Plaintiff had two medically determinable mental impairments, *i.e.*, unspecified depression and anxiety disorder, the ALJ was required to "rate [the applicant's] degree of limitation in the[] [areas of ability to] understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself[,]" 20 C.F.R. § 416.920a(c)(4), using a "five-point scale: None, mild, moderate, marked, and extreme." *Id.* The ALJ correctly applied the "special technique" required by 20 C.F.R. § 416.920a. Notably, that regulation incorporates a presumption that when the "degrees of [the applicant's] limitation [are] 'none' or 'mild,' [the Commissioner] will generally conclude that [the applicant's] impairment[s] is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 416.920a(d)(1). In making that determination, the ALJ must "incorporate the pertinent findings and conclusions based on the technique[, including] the significant history . . . and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment[s]." 20 C.F.R. § 416.920a(e)(4). Here, the ALJ reviewed the notes and findings of every doctor who examined Plaintiff up until the date he applied for SSI (Tr. 17), and correctly noted that none of them ever suggested that his mental limitations were more than mild or fleeting. In 2019, Dr. Wuhib noted only "mild" limitations in Plaintiff's functioning. (Tr. 360–61.) Plaintiff's physician, Dr. Delmonte, also noted that Plaintiff's communication, ability to care for himself, and to make

13

decisions were adequate and repeatedly described Plaintiff as a "normal person." (Tr. 448.) Dr. Mihu did note Plaintiff's reports of feeling aggression and depression, but also noted that they "could be likely secondary to the Keppra usage," and after adjusting Plaintiff's dosage, noted that Plaintiff "was feeling good" and did not mention these symptoms again. (Tr. 453.)[12] Taken together, these treatment notes show that Plaintiff's mental limitations were mild and that his mental impairments were therefore not severe. *Id.* (noting that when the "degrees of [the applicant's] limitation [are] 'none' or 'mild,' [the Commissioner] will generally conclude that [the applicant's] impairment is not severe[.]") (quoting 20 C.F.R. § 416.920a(d)(1)).

### B. The ALJ Correctly Evaluated Plaintiff's Physical Impairment Under Listing 11.02

At step three of the analysis, "the claimant 'must present medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *See Claymore v. Astrue*, 519 F. App'x 36, 37 (2d Cir. 2013) (cleaned up). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 538 (1990). In other words, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Crowell v. Comm'r of Soc. Sec. Admin.*, 705 F. App'x 34, 35 (2d Cir. 2017) (emphasis in original) (citations omitted).

Here, the ALJ correctly found that Plaintiff's seizures, as reflected by the record, were too infrequent to meet the requirements of Listing 11.02. Under that listing, disability is established when "[g]eneralized tonic-clonic seizures [occur] at least once a month for at least 3 consecutive months," or when "[g]eneralized tonic-clonic seizures [occur] at least once every 2 months for at

---

[12] While, ordinarily, the Court may have required the Commissioner to recontact Dr. Mihu to clarify her comments, in this instance, such contract was not required (as Dr. Mihu's comments were not in tension with those of other doctors or the overall record) and because Dr. Mihu passed away and no more development of the record is possible.

14

least 4 consecutive months [] despite adherence to prescribed treatment." 20 C.F.R. § Part 404, Subpt. P, App'x 1, § 11.02(A), (C). Here, Plaintiff had one seizure in October 2013, one in 2015, one in February 2016, and one in October 2018. (Tr. 288, 295, 411, 419–20.) Plaintiff's 2018 seizure occurred due to his failure to take his anti-seizure medication. (Tr. 419–20.) And, while Plaintiff also claimed to have suffered two seizures in 2017, there is virtually no support for that claim in the record. Nonetheless, even crediting that claim, as the ALJ did, the frequency of Plaintiff's seizures did not meet the requirements of Listing 11.02. (Tr. 18, 358; *see also id.* 228 (noting five seizures overall between 2013 and 2018, and an additional "two [seizures] while I slept" at an unspecified date).)[13] Thus, the ALJ's determination at step three that Plaintiff's seizure condition did not meet or equal any of the Listings was supported by substantial evidence.

### C. The ALJ Correctly Determined Plaintiff's Residual Functional Capacity

Likewise, at step four, the ALJ correctly determined that Plaintiff had the RFC to perform a range of light work, with certain limitations. The record supported the finding that Plaintiff's seizure history was infrequent, and that for the most part, medication successfully controlled their occurrence. (*See, e.g.*, Tr. 453 (noting that Plaintiff "feels good, he has not had any seizure activity since [last visit over five months ago]."); Tr. 456 (similar); Tr. 463 (similar); Tr. 465 (similar); Tr. 467 (similar).). At the time the ALJ rendered her decision, nearly two years had passed since

---

[13] Plaintiff testified at the ALJ hearing that in 2017 he experienced seizures. It is unclear why the ALJ credited this testimony, since it is not otherwise supported by the record. (Tr. 18.) Nonetheless, even assuming *arguendo* that Plaintiff experienced this frequency of seizures in 2017, his seizure condition would still not meet or equal Listing 11.02, which, in addition to a certain minimum frequency of seizures, requires a showing of "marked limitation in one of the following: [1] Physical functioning []; or [2] Understanding, remembering, or applying information []; or [3] Interacting with others []; or [4] Concentrating, persisting, or maintaining pace[]; or [5] Adapting or managing oneself[]." *See* 20 C.F.R. § Part 404, Subpt. P, App'x 1, § 11.02(C). As further discussed *supra*, the record is devoid of any medical evidence supporting such a finding.

15

Plaintiff's last documented seizure. Furthermore, all of the evidence before the ALJ suggested that Plaintiff's limitations were minor. Dr. Trimba noted "no limitation" in Plaintiff's ability to perform routine functions and noted "mild to moderate" limitations in his ability to "push, pull, or carry heavy objects." (Tr. 356.) Dr. Wuhib noted "mild limitations," "caused by depression and anxiety," in Plaintiff's ability to act on "complex directions." (Tr. 360.) Likewise, Dr. Shtock merely advised that Plaintiff "should refrain from unprotected elevated heights, driving, using heavy equipment, and handling blunt instruments." (Tr. 375.) After giving full consideration to these opinions and finding them persuasive (Tr. 20–21), the ALJ found that Plaintiff had the ability to perform light work, with certain limitations. This determination was supported by substantial evidence in the record. Indeed, there is no evidence in the record—from any treating or consultative source—suggesting that Plaintiff had no capacity to perform work. Similarly, Plaintiff's testimony at the ALJ hearing does not suggest otherwise. He testified that he was no longer driving, that he had one to two seizures a year, and that his last job—as a carousel operator—was in 2016 (from which he was fired after having fainted in a closet). (Tr. 47–49.) The ALJ's conclusion that Plaintiff had the capacity to do light and simple work, assuming limited exposure to the public and never operating moving machinery or working under extreme weather conditions, finds substantial support in the record.

## D. The Vocational Expert's Testimony Supported the ALJ's Conclusions

The testimony of the vocational expert was sufficient to support the ALJ's determination at step five regarding jobs that Plaintiff could perform based on his RFC. At the outset, the Court notes that the failure to include certain limitations in a hypothetical posed to a vocational expert is subject to harmless error review. *See Holler v. Saul,* 852 F. App'x 584, 586 (2d Cir. 2021) ("To the extent . . . the hypothetical presented to the vocational expert . . . was error, it is harmless

16

error."); *Akey v. Astrue*, 467 F. App'x 15, 17 (2d Cir. 2012) (reviewing failure to include limitation in the hypothetical to the vocational expert under a harmless error standard). Specifically, "posing an erroneous hypothetical question is harmless where the hypothetical otherwise implicitly accounted for the claimant's limitations[.]" *Cherry v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 658, 662 (2d Cir. 2020) (citation omitted).

Here, the ALJ omitted from her hypothetical Dr. Stock's advice that Plaintiff may not "deal with blunt objects," and as a result the vocational expert recommended that Plaintiff become, *inter alia*, a "power screwdriver operator." (Tr. 54–55, 375.) Nonetheless, the Court finds that this error was harmless. The ALJ asked the vocational expert to find jobs with "no hazards, such as dangerous moving machinery or unprotected heights." (Tr. 54.) The term "hazards" fairly encompasses dealing with blunt objects, and the phrase "such as" suggests that the ALJ used a non-exhaustive list of examples for potential hazards. Further, the vocational expert also recommended the jobs of "routing clerk" and "mail clerk," which fully address all of Plaintiff's limitations. Thus, the vocational expert erred by including "power screwdriver operator" as a job that Plaintiff could perform, but this error was harmless and does not undermine the conclusion there were enough jobs available in the national economy that Plaintiff could perform.

**CONCLUSION**

For the foregoing reasons, the Court affirms the Commissioner's decision. The Clerk of Court is respectfully directed to enter judgment accordingly and terminate this action.[14]

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 24, 2023
       Brooklyn, New York

---

[14] The Court notes that Plaintiff produced an April 27, 2022, letter from Pedro A. Corzo, M.D., asserting that "[b]ecause of his medical history, [Plaintiff] is unable to obtain a job." (Dkt. 15, at 6.) Such letter, produced years after the ALJ's decision, does not change the result of this case. Nonetheless, the Court's decision does not interfere with Plaintiff's ability to file a fresh claim for disability, from an appropriate date, based on new evidence and materials.